**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SUNDAY IYOHA,

       *Plaintiff*,

    v.

ARCHITECT OF THE CAPITOL,

       *Defendant*.

Civil Action No. 24-2831 (TJK)

## MEMORANDUM ORDER

Sunday Iyoha is a longtime employee of the Architect of the Capitol, the federal agency that maintains the United States Capitol complex.  Last year, he and the Architect reached a settlement agreement that would resolve Iyoha's complaints of discrimination.  Among other concessions, the Architect agreed that it would increase Iyoha's pay level under the scale for federal employees.  But Iyoha has received neither that salary increase nor the other benefits he says he bargained for.  In moving to dismiss Iyoha's case, the Architect explains its non-compliance for the first time in its reply brief: it says the settlement includes a scrivener's error—a mistake, in non-legalese—about Iyoha's new salary.  So the Architect contends that the Court should fix that mistake and dismiss the case because it will comply with the reformed contract.

If that argument sounds like a stretch, it is—at least at this early stage of the case.  Courts do not invoke the doctrine of scrivener's error lightly.  The evidentiary standard is high and, unsurprisingly, calls for *evidence* rather than unsupported reply-brief assertions.  And the limited record suggests that Iyoha does not share the Architect's view of what the parties intended when they signed the settlement.  To be sure, the facts may end up corroborating the Architect's theory.  But a theory relying on factual development is no basis for dismissing a case at the pleading stage,

so the Court will deny the Architect's motion.

## I.    Background

For almost seventeen years, Iyoha has worked for the Architect of the Capitol in its information-technology department.  ECF No. 1 ("Compl.") at 1.  His tenure, though, has allegedly been fraught with discrimination and retaliation.  Iyoha—a black man of Nigerian ancestry—claims that managers "have discriminated against" him because of his "accent and national origin." *Id.*  For example, he says that he applied for but was "denied" the role of deputy chief information officer.  *Id.* at 1–2.  So Iyoha apparently filed several complaints with the Office of Congressional Workplace Rights.  *See id.* at 1.

In early 2024, a mediator oversaw discussions geared towards a global settlement of Iyoha's charges of discrimination.  Compl. at 1.  By the end of that April, Iyoha and the Architect had executed a "Confidential Settlement Agreement and Release."  *Id.* at 11.[1]  That agreement purported to "settle any and all matters relating to Mr. Iyoha's employment with" the Architect. *Id.*  More precisely, Iyoha would give up all legal claims "exist[ing] at the time" of signing and would drop his pending claims with the Workplace Rights office.  *Id.* at 11–13.  In exchange for that waiver, the Architect agreed to several concessions.  One was a lump-sum payment of $1,000. *See id.* at 13.  Another was a year-long period of "priority consideration in interviewing" for certain "posted vacancies" within the agency.  *See id.* at 14–15.  A third was a change to Iyoha's performance review from late 2023.  *See id.* at 14.  And the last—and seemingly the one leading to this lawsuit—was a "within grade step increase" on the pay scale for federal employees "from a GS-

---

[1] The Architect says that Iyoha materially breached the confidential agreement by including it in his complaint.  But that point is irrelevant here and undermined by the provision explaining that the "[p]arties may disclose" the agreement "if necessary to enforce any provision"—precisely what Iyoha wants to do.  Compl. at 17.

14, Step 9 to a GS-14, Step 10." *Id.* Iyoha and the Architect's acting Chief Administrative Officer signed the agreement in mid-April. *See id.* at 18. About two weeks later, the Executive Director of the Office of Congressional Workplace Rights "approved" this "settlement agreement." *Id.* at 20.

Despite that approval, Iyoha alleges that he has not received what he bargained for. Rather, he claims that the Architect "breach[ed]" the "fully signed" agreement. Compl. at 1. Iyoha began emailing the Architect's office of general counsel in late May to "find out when" the "terms of [the] settlement" will be "reflected in [his] pay." *Id.* at 6, 10. That office eventually responded that the "changes should be showing up shortly." *Id.* at 9. They did not, so Iyoha followed up in June. *See id.* at 7. This time, the deputy general counsel told Iyoha that the Architect "intends to effect the terms to which it has agreed in the settlement agreement." *Id.* at 6.

Still without his settlement benefits in October 2024, Iyoha sued the Architect over this dispute. He asks the Court to order the Architect "to honor and execute" the agreement "with all retroactive pay and benefits deriving from" it. Compl. at 5. The agency moved to dismiss, relying solely on jurisdictional grounds: because Iyoha's claim is "ultimately" one "for breach of contract in excess of $10,000," the Court of Federal Claims has "exclusive jurisdiction." ECF No. 10 at 3. But after realizing that it erred on that front, the Architect withdrew "its arguments regarding subject matter jurisdiction" in its reply. ECF No. 13 at 1 n.1. Now, the Architect seeks reformation of the contract and dismissal based on a putative "scrivener's error" in the settlement agreement. *See generally* ECF No. 13.

## II. Legal Standards

A plaintiff must establish the Court's subject-matter jurisdiction to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1). *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). The Court "assume[s] the truth of all material factual allegations in the complaint and

'construe[s] the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged,' . . . and upon such facts determine[s] jurisdictional questions." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)).  Without subject-matter jurisdiction over a claim, the Court must dismiss it.  *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A plaintiff states a facially plausible claim when he pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court accepts as true "all well-pleaded factual allegations" and "construes reasonable inferences from those allegations in the plaintiff's favor."  *Sissel v. HHS*, 760 F.3d 1, 4 (D.C. Cir. 2014).  But "mere conclusory statements" are not enough to establish a plausible claim, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  And "although a pro se complaint" like Iyoha's "must be construed liberally, the complaint must still present a claim on which the Court can grant relief."  *Untalasco v. Lockheed Martin Corp.*, 249 F. Supp. 3d 318, 322 (D.D.C. 2017) (citation omitted).

## III.    Analysis

The Architect originally moved to dismiss on jurisdictional grounds, arguing that the Tucker Act vests exclusive jurisdiction in the Court of Federal Claims for contract claims against the United States when more than $10,000 is at stake.  ECF No. 10 at 3; *see also, e.g.*, *Greenhill v. Spellings*, 482 F.3d 569, 572 (D.C. Cir. 2007).  Although the agency withdrew that argument, *see* ECF No. 13 at 1 n.1, the Court must police its own jurisdictional borders.  But the Court too sees no jurisdictional problem at this stage.  Iyoha seems to premise his claim on a contract with

the Architect; he wants the agency "to honor and execute the . . . settlement agreement." Compl. at 5. That kind of claim brings into play the Little Tucker Act, which provides district courts with jurisdiction over "civil action[s] or claim[s] against the United States" that are "founded" upon "any express or implied contract with the United States," so long as they do "not exceed[] $10,000 in amount." 28 U.S.C. § 1346(a)(2). On this limited record, the Court has no reason to think Iyoha's claim crosses that monetary threshold. To the contrary, the Architect—perhaps in the best position to know—*withdrew* that exact argument after learning more about Iyoha's employment.

The only issue, then, is whether the doctrine of scrivener's error warrants dismissing the case. ECF No. 13 at 3. That doctrine, which the Architect and courts sometimes refer to as a type of "mutual mistake,"[2] permits courts to "reform" an agreement "in equity" when "clear and convincing evidence" shows that "a mistake [was] made in the drafting" such that "the written agreement fails to express the true agreement of the parties." *Air Line Pilots Ass'n v. Shuttle, Inc.*, 55 F. Supp. 2d 47, 52 (D.D.C. 1999) (citation and emphasis omitted). Put slightly differently, reforming a contract is appropriate when the parties' intentions are "identical at the time of the transaction," but the drafting error causes the "written agreement" to depart from that shared intent. 27 Williston on Contracts § 70:93 (4th ed.).

---

[2] The doctrines of scrivener's error and mutual mistake are conceptually close but distinct. The former applies when "the only mistake is in the reduction of the agreement to writing." 27 Williston on Contracts § 70:93 (4th ed.). The latter, though, covers situations when the "parties entertained a material mistake of fact that went to the heart of their bargain." *Harbor Ins. Co. v. Stokes*, 45 F.3d 499, 501 (D.C. Cir. 1995). An example illustrates the difference. If a person contracts to buy an authentic Picasso painting for $2 million, a typo listing the sales price as $20,000 might qualify as a scrivener's error. But if the painting turns out to be a replica even though both parties thought it was the original, then mutual mistake might apply. Although the Architect references "mutual mistake" alongside its scrivener's-error argument, *see* ECF No. 13 at 2, the doctrinal nuance makes no difference here given the Architect's evidentiary shortcomings.

The Architect believes that this case justifies reformation—and, after that, dismissal—because Iyoha's opposition pinpointed the "scrivener's error" underlying this dispute.  ECF No. 13 at 2–3.  In the Architect's view, the parties agreed to a one-level pay raise.  *See id.*  The problem is that the signed agreement includes a mistake about Iyoha's current pay scale.  Iyoha explained that "he is already a GS 14 step 8," ECF No. 12 at 1, but the parties (mistakenly, according to the Architect) referred to him as a "GS-14, Step 9" in the settlement agreement, ECF No. 13 at 1; *see also* Compl. at 14 (copy of agreement stating that the Architect will increase "Iyoha from a GS-14, Step 9 to a GS-14, Step 10").  So the Architect argues that the Court should reform the contract by adjusting the pay-scale provision to say that Iyoha will jump from Step 8 to Step 9 rather than from Step 9 to Step 10.  The Architect adds that it would "comply with those terms," which in turn would warrant dismissing the case.  ECF No. 13 at 3.

But courts do not reform contracts whenever one party identifies what it calls a scrivener's error.  Instead, the party asking for that relief must show "by clear and convincing evidence" that a drafting mistake caused the written agreement to depart from the parties' shared intent.  *Air Line Pilots Ass'n*, 55 F. Supp. 2d at 53.  This "standard of proof" for "establishing a scrivener's error" is "rigorous."  *Int'l Union of Elec., Elec., Salaried, Mach. & Furniture Workers, AFL-CIO v. Murata Erie N. Am., Inc.*, 980 F.2d 889, 908 (3d Cir. 1992).  And none of the cases that the Architect cites resolved this issue at the pleading stage—to say nothing of resolving it when first raised in a reply brief.  *See Air Line Pilots Ass'n*, 55 F. Supp. 2d at 48–49 (addressing scrivener's error at summary judgment); *Murata*, 980 F.2d at 894 (reviewing summary-judgment decision); *Cinelli v. Sec. Pac. Corp.*, 61 F.3d 1437, 1439 (9th Cir. 1995) (same); *Isaac v. First Nat'l Bank of Md., D.C.*, 647 A.2d 1159, 1160 (D.C. 1994) (same).  That pattern makes sense.  Figuring out whether both parties mistakenly entered an agreement with a drafting error that undermines their intent—just

like determining whether a "mutual mistake of fact" exists—"is normally a factual question." *Hill v. A.O. Smith Corp.*, 801 F.2d 217, 222 (6th Cir. 1986); *see also, e.g.*, *Ill. Cent. Gulf R.R. Co. v. R.R. Land, Inc.*, 988 F.2d 1397, 1402 (5th Cir. 1993) ("determination of mutual mistake is a fact question" (citation omitted)).

That general rule applies here and shows why the Architect has not come close to establishing that the scrivener's-error doctrine warrants reformation and dismissal on this record. The crux of the Architect's theory is that both parties (1) thought that the settlement agreement would bump Iyoha only from Step 8 to Step 9 on the pay scale, but (2) mistakenly signed an agreement that pushed him to Step 10. The Architect, though, has not offered clear and convincing evidence—or really any evidence at all—showing that to be true. As mentioned, the Architect pressed this scrivener's-error theory only in its reply brief. So in addition to the evidentiary shortcomings inherent at the pleading stage, Iyoha had no opportunity to contest this point in his opposition, making this case a good illustration of why arguments that show up "for the first time in . . . reply" are typically "waived." *Lindsey v. District of Columbia*, 879 F. Supp. 2d 87, 96 (D.D.C. 2012). True, the Architect says that it has "only now been able to elucidate" the "mutual mistake of fact" about Iyoha's current pay level. ECF No. 13 at 3. But the Architect presumably has employee records showing just that, so the agency should have "elucidated" something as simple an employee's pay grade far earlier—especially after receiving two extensions to the deadline for filing its motion. *See* Min. Order of Dec. 17, 2024; Min. Order of Jan. 15, 2025.

More to the point, the Court cannot decide the fact-intensive question of scrivener's error now. Could both Iyoha and the Architect have intended to agree to a one-level increase from Step 8 to Step 9 even though the agreement they signed said that he would go to Step 10? Maybe. But deciding that issue "necessarily entails a consideration of facts." *T Street Dev., L.L.C. v. Dereje*

& *Dereje*, No. 05-cv-524 (GK), 2005 WL 3466651, at *6 (D.D.C. Dec. 19, 2005).  And Iyoha, even without knowing that the Architect would argue scrivener's error in reply, seems to "dispute[]" the idea that both parties were mistaken about the pay-scale increase.  *Id.* (holding that *summary judgment* was inappropriate on the issue of mutual mistake).  His version of the facts is that the parties *did* agree that he would move to Step 10.  *See* ECF No. 12 at 1.  As Iyoha recounts the intended agreement, one provision would "increase" him to "step 9," and then "the non-selection case" would lead to "*another*" jump "to step 10."  Compl. at 2 (emphasis added).  And if factual development bears that out—*i.e.*, if Iyoha believed that the agreement would bump him to step 10 (which, again, is what the agreement says)—then the Architect's theory seems to fall apart. In other words, even if the Architect is right that the agreement mistakenly identified Iyoha's *current* pay level as Step 9 rather than Step 8, that error alone would not justify reforming the contract as it requests.  The Architect wants more than that edit; it wants the contract to reflect Iyoha's *future* pay level as Step 9 rather than Step 10.  *See* ECF No. 13 at 3.  But the Architect has not shown by clear and convincing evidence that a scrivener's error undermines the parties' shared intent such that reforming the contract in this way is appropriate.  That is so because even if the parties were mistaken about Iyoha's current pay level, Iyoha might have intended—as he seems to claim—that the agreement would push him to Step 10 regardless of his starting pay level.

The Architect may, of course, develop a record that validates its theory and meets the clear-and-convincing standard.  But just asserting scrivener's error in a reply brief supporting a motion to dismiss is not enough.

## IV.    Conclusion and Order

For all the above reasons, it is hereby **ORDERED** that Defendant's Motion to Dismiss, ECF No. 10, is **DENIED**.

**SO ORDERED**.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: May 14, 2025